**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| MALORI WAMPLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:11-cv-0606-TWP-TAB |
| | ) | |
| INDIANAPOLIS COLTS, | ) | |
| | ) | |
| Defendant. | ) | |

**ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This matter comes before the Court on Defendant's Motion for Summary Judgment (Dkt. #20) and Plaintiff's Motion for Leave to File Second Amended Complaint (Dkt. #48). In May 2010, Plaintiff Malori Wampler ("Ms. Wampler") joined the cheerleading squad of the Defendant Indianapolis Colts (the "Club"). During her pre-hire interview, Ms. Wampler assured the Club that she had never previously posed nude for any photographs. On or about November 12, 2010, the Club received an anonymous letter from a fan, which included photographs of Ms. Wampler attending a Playboy party wearing only body paint over her private parts. Almost immediately, the Club terminated Ms. Wampler's employment. According to the Club, it did so because of the risqué nature of the photographs and the lie she told during the pre-hire interview.

In the aftermath of the termination, Ms. Wampler filed this lawsuit, alleging that the Club terminated her employment because of her gender and her race, both in violation of Title VII.[1] Following the Club's motion for summary judgment, Ms. Wampler dropped her gender discrimination claim, leaving only her race and national origin claim. Specifically, Ms. Wampler alleges that she was terminated because she is Indonesian. For the reasons set forth below, the

[1] Initially, Ms. Wampler filed her race discrimination claim as a Section 1981 claim, since she had not yet received a right to sue letter from the Equal Employment Opportunity Commission ("EEOC"). However, she recently received that letter and has requested leave to update her complaint accordingly.

Club's Motion (Dkt. #20) is **GRANTED**. And, Ms. Wampler's Motion for Leave to File Second Amended Complaint is **DENIED**.

## I. BACKGROUND

Professional sports organizations go to great lengths to protect their reputations in the community. As any Indianapolis Pacers fan can attest, one bad incident (such as an ugly courtside brawl involving Detroit Pistons fans) can tarnish an organization's reputation and have a lasting negative impact on ticket sales. *See* Josh Sanburn, *NBA Playoffs: Why Indiana Pacers Fans Aren't Showing Up to Games*, TIME, http://keepingscore.blogs.time.com/ 2012/05/17/ indiana-pacers-fans-dont-attend-games/ (last visited August 6, 2012) (noting that low attendance in 2012 may be partially because "fans . . . are still nursing a decade-long hangover from the ugliness that was the Detroit brawl," which likely "pushed a good number of Hoosiers away from the franchise"). The Club is no exception, making "every effort to protect its public image." (Dkt. #22-2 at 1.)

Indianapolis Colts Cheerleaders are, in the Club's view, "ambassadors in the community and throughout the state." *Id*. at 2. As such, Club cheerleaders must abide by the "Indianapolis Colts Cheerleader Agreement," which contains the following covenant:

> Cheerleader agrees not to commit any act that will or may create notoriety (including, but not limited to, posing nude or semi-nude in or for any media or publication whatsoever), bring Cheerleader into public disrepute, or reflect adversely on Club or its sponsors. Cheerleader understands that she will serve as a public representative of the Club from time to time and that it is important to this employment relationship that she be viewed in a positive manner. Cheerleader agrees to behave in accordance with socially acceptable mores and conventions.

(Dkt. 40-3 at 3) (emphasis added).

By way of background, Ms. Wampler is a female American citizen of Indonesian descent. Her parents are both American citizens, and her father is Indonesian, making her half Indonesian.

Nonetheless, as the Club notes (directly above her photograph, which is inserted into the brief itself), "[w]hile Ms. Wampler is certainly an attractive young lady, she does not have obviously Asian features." (Dkt. #21 at 3.)

In May 2010, Ms. Wampler earned a spot on the Club's cheerleading squad and signed the "Indianapolis Colts Cheerleader Agreement."[2] As a cheerleader, Ms. Wampler attended practices, performed at games, made appearances at various Club events, and was featured in a swimsuit calendar. Cheerleaders are paid $100.00 per home game and after their 20th appearance, may earn $100.00 per appearance. (Dkt. #39 at 8.) Ms. Wampler prepared a short biography for the Club, which was scheduled to be included in the January 1, 2011 issue of the in-house magazine "Scout." The biography that Ms. Wampler prepared read as follows:

> Malori was born in Honolulu, Hawaii while her parents were stationed in the Army. Her mom is originally from Canada and her dad is from Indonesia, but she was raised in Indianapolis since she was 2 years old.

Notably, however, because Ms. Wampler was terminated months before the magazine issued her biography was never published.

Significant to this dispute, during her pre-hire interview, Ms. Wampler informed the Club's cheerleading coordinator, Theresa Pottratz ("Ms. Pottratz"), that she had been involved with the Playboy organization in the past. Specifically, Ms. Wampler was selected to be a "Girl of Golf" (i.e., a host) at various golf scrambles throughout the country sponsored by Playboy Golf. Not surprisingly, Playboy-sponsored parties were often held following the Playboy golf scrambles. Prior to two of these parties, one in 2009 and one in 2010, a Playboy Golf employee asked Ms. Wampler to wear latex-based body paint – "a painted on bikini or painted on lingerie"

---

[2] Notably, when Ms. Wampler made the squad, she decided to delay pursuing a physical therapy position for one year so that she could devote her time to the Club. Presently, Ms. Wampler holds a Doctorate of Physical Therapy from Indiana University and works as a physical therapist.

(Dkt. #40-1 at 4) – to the Playboy golf parties. Ms. Wampler agreed, and an artist applied latex-based paint to the breasts, pelvic area and buttocks of her nude body. She also posed for various photographs. During her pre-hire interview, Ms. Wampler assured Ms. Pottratz that she had not posed nude for any photographs during her stint with Playboy. This arguable fib unraveled on November 12, 2010, when the Club received an anonymous letter from a fan, which included photographs (apparently downloaded from a website) of Ms. Wampler posing in pictures with only body paint covering her breast, pelvic area and buttocks.

On November 15, 2010, after the photographs surfaced, a meeting was held among various Club employees. In the end, Pete Ward ("Mr. Ward"), the Club's Chief Operating Officer, took a hard line and directed Tom Zupancic (Mr. Zupancic"), the Club's Senior Vice President of Sales and Marketing, to terminate Ms. Wampler's employment "because of her nude pictures and her dishonesty." (Dkt. #21 at 5.)[3] According to Mr. Ward's affidavit, he has "never met Ms. Wampler or read any biographical sketch of her" and "was unaware that Ms. Wampler claimed her race to be anything other than Caucasian and it was [his] belief that she was Caucasian." (Dkt. #22-1 at 3.) By way of affidavit, Mr. Zupancic echoes this same statement regarding his lack of knowledge about Ms. Wampler's race. (Dkt. #22-2.) Once Mr. Ward issued the order, Mr. Zupancic and Ms. Pottratz met with Ms. Wampler and told her that she was terminated effective immediately.

The day after her termination, Ms. Wampler sent Ms. Pottratz the following email:

> Hi Theresa,
>
> I'm still in shock right now and very taken aback by how suddenly this happened. I am hurt/disappointed that there was not even a warning or discussion about the situation. It's hard to believe that I was literally cheering on the field the day before. Did this just come up on Monday? If not, when did this come about?

[3] Other evidence suggests that additional individuals were also involved in the decision to terminate Ms. Wampler's employment, but that fact makes no difference to the outcome of this case.

> I feel that now that I've had time to think, a lot of things aren't coming together for me and I have a lot of questions. Can you send me the picture? Who received the picture and how was it sent (e-mail, mail)? And who sent it? To me I just don't understand why this is happening now and I feel like there is someone who is being malicious/out to get me. Anything that is out there has been there for a while now and does not have my name on it.
>
> My involvement with Playboy was known during the interview process. I have never posed nude or been in the magazine. And I had said that I had been to a mansion party. This was long before the Colts and I feel I have done nothing but try to be anything and everything for the organization. I've tried to do everything right and revolved my life around cheerleading.
>
> It's an embarrassing/humiliating situation to be in and I just don't understand why I wouldn't be allowed to just finish out the season. I also find it a bit hypocritical when there have been girls on the squad who have had relations with players, scouts, and mascots or have things such as lingerie pictures online WHILE they were Colts Cheerleaders. How is my situation, which was before making the team and also talked about during the interview process worse to the point where I am not even able to finish the season?
>
> ….

The next day, on November 17, 2010, Ms. Wampler received the following email from Mr. Zupancic:

> Malori,
>
> Theresa passed your note on to me so please consider this your response from the Colts organization. You carried out your duties as a cheerleader very professionally. Your commitment on and off the field was outstanding and for that I thank you. Our Cheerleaders are ambassadors in the community and represent the organization across the state and beyond. Colts cheerleaders are held in high esteem by the Colts organization and by our fans. We were made aware of the photos on Monday and reacted immediately to the situation which resulted in your dismissal. Regarding our knowledge of your involvement with Playboy, it was never brought up that these pictures existed and that they would be posted on a website. The nature of the pictures constitutes inappropriate conduct for a Colt's cheerleader. I hope you understand our position and why our decision was to dismiss you. Thank you again for your hard work this season and good luck in your future endeavors.

Shortly thereafter, on November 23, 2010, Ms. Wampler, through counsel, filed an EEOC charge alleging sex discrimination under Title VII. The EEOC charge did not mention

race or national origin. Then, on May 5, 2011, Ms. Wampler filed a complaint in this Court, alleging gender discrimination and race discrimination under Title VII. Following the Club's motion for summary judgment, Ms. Wampler dropped her gender discrimination claim (in which she alleged that she was similarly situated to Indianapolis Colts football players, despite the innumerable differences between the two jobs), leaving only her race and national origin claim. Additional facts are added below as needed.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 489-90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of a claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citation and internal quotations omitted). Finally, "neither the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the

material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and internal quotations omitted).

## III. DISCUSSION

After amending her complaint (Dkt. #8), Ms. Wampler's race and national origin claims arise under Title VII. Ms. Wampler proceeds with her discrimination claim using the familiar burden-shifting framework inaugurated by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Using the indirect method of proof, Ms. Wampler can meet the elements of a *prima facie* case of discrimination by showing that: (1) she is a member of a protected class; (2) she was meeting the Club's legitimate performance expectations; (3) she suffered a material, adverse employment action; and (4) she was treated less favorably than similarly situated individuals outside of her protected class. *Pantoja v. American NTN Bearing Manufacturing Corp.*, 495 F.3d 840, 845 (7th Cir. 2007). Once the plaintiff makes out a *prima facie* case, the Club must state a legitimate, non-discriminatory reason for the adverse employment action. *Smeigh v. Johns Manville, Inc.*, 643 F.3d 554, 560 (7th Cir. 2011). If a legitimate, non-discriminatory reason is offered, Ms. Wampler must then come forward with evidence that the stated reason is not the true reason one but rather a false pretext, thus allowing an inference of discrimination. *Id.*

Elements (1), (2), and (3) are largely undisputed. Ms. Wampler is Indonesian, she was meeting the Club's expectations, and she was terminated. The real dispute, then, is whether she was treated less favorably than a similarly situated individual outside of her protected class. "Whether two employees are 'similarly situated' is a common sense inquiry that depends on the employment context." *Filar v. Board of Educ. of City of Chicago*, 526 F.3d 1054, 1061 (7th Cir. 2008) (citation omitted). Similarly situated employees must be directly comparable in "all material respects." *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002)

(citation omitted). Relevant factors for making this determination include "whether the employees (i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications. . . ." *Bio v. Federal Express Corp.*, 424 F.3d 593, 597 (7th Cir. 2005) (citation and internal quotations omitted).

To satisfy the similarly situated element, Ms. Wampler points to Breanna Fonner (Ms. Fonner"), a fellow Club cheerleader who is Caucasian. At first blush, Ms. Fonner's circumstances appear quite similar to those of Ms. Wampler. Ms. Fonner posed in lingerie as part of a promotional advertisement for a jewelry store, and the photos appeared on the photographer's website. Although he photographer for her photo shoot was also the Club's photographer, Ms. Fonner did not get prior approval for the photo shoot, as required by the Colts Cheerleader Agreement. In the photos, Ms. Fonner is on top of a bed with one or two men. And, as fate would have it, shortly after Ms. Wampler's termination, yet another fan sent Ms. Pottratz a letter, which read as follows:

> I was appalled to find very unprofessional, inappropriate photos of your Cheerleader, Breanna (attached) floating around on the internet. There is an entire photoshoot labeled BlumLux consisting of many lingerie photos of Breanna and a man. I think these photographs are extremely inappropriate and explicit when a Colts Cheerleader is wearing black lingerie posing in a bed with TWO men for the world to view.…

After receiving the letter, Ms. Pottratz spoke with Ms. Fonner, who informed her that she thought the photos were "okay," in part because the photographer was the Club photographer. For her transgression (failing to secure the Club's permission to do the modeling shoot, in violation of paragraph 9(C) of the Cheerleader Agreement), the Club denied Ms. Fonner an all-expense paid trip to the Pro Bowl, but did not terminate her. In fact, Ms. Fonner remains a Club cheerleader today.

From Ms. Wampler's standpoint, she is clearly similarly situated to Ms. Fonner. Both were selected to be Club cheerleaders for the 2010-2011 season and had the same supervisors. Both were required to sign the same Cheerleader Agreement. Both were required to abide by the same Special Cheerleader Covenants, which require that the Cheerleaders "behave in accordance with socially acceptable mores and conventions." Both posed for risqué photos, which compelled fans to complain. But only one of them, Ms. Wampler, was terminated.

However, for two reasons, it is questionable whether Ms. Fonner and Ms. Wampler are, in fact, similarly situated. First, Ms. Fonner wore lingerie in her photograph, whereas Ms. Wampler did not wear any clothing, but wore only body paint. From the Club's vantage point, Ms. Wampler's photos were more scandalous than Ms. Fonner's. Second, Ms. Wampler arguably *lied* about posing nude, whereas Ms. Fonner simply did not address the issue with the Club before modeling for the photo shoot. *See Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 397 (7th Cir. 2000) (holding that former employee who lied about misconduct until his termination meeting was not similarly situated to employee who came clean at an earlier time). Perhaps Ms. Fonner's conduct could be construed as a lie by omission, but the ethical disclosure duties of NFL cheerleaders is a question best left for another day. In the end, it might be a close call whether these differentiating variables are enough to defeat the similarly situated element. But, as explained below, the Court finds that Ms. Wampler's claim fails for a separate reason. Therefore, the Court will assume that Ms. Wampler can meet this element. This is not an absurd assumption. As the Seventh Circuit has noted, "a plaintiff need not present a doppelganger who differs only by having remained in the employer's good graces." *Filar*, 526 F.3d at 1061.

Assuming Ms. Wampler can make out a *prima facie* case, the Club must state a legitimate, non-discriminatory reason for the adverse employment action. The Club has done so:

Ms. Wampler was photographed in arguably unseemly pictures and lied about it. In accord with the *McDonnell Douglas* framework, the burden now shifts to Ms. Wampler to show that the Club's explanation is pretextual. "Pretext means a dishonest explanation, a lie rather than an oddity or an error." *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 983 (7th Cir. 2001) (citation and internal quotations omitted). For pretext determinations, the Court's only concern "is the honesty of the employer's explanation." *Id*. at 984 (citation and internal quotations).

Here, Ms. Wampler offers four reasons why the Club's explanation is pretextual: (1) the Club has offered shifting or inconsistent reasons for Ms. Wampler's termination; (2) the Club knew that Ms. Wampler was Indonesian; (3) the Club did not uniformly apply its cheerleading policies; and (4) Ms. Wampler's conduct was insufficient to motivate her termination. Each of these arguments is addressed in turn.

First, as Ms. Wampler highlights, "[o]ne can reasonably infer pretext from an employer's shifting or inconsistent explanations for the challenged employment decision." *Appelbaum v. Milwaukee Metro. Sewerage Dist.*, 340 F.3d 573 (7th Cir. 2003). Ms. Wampler argues that this is precisely what the Club has done. To bolster this claim, Ms. Wampler claims that the Club has offered four different explanations for her termination:

(1) the explanation provided to Wampler at the time of her termination: a fan had mailed in "painted pictures" and the Colts did not want to be "affiliated with the situation";

(2) the explanation provided by Zupancic in his November 17, 2010 e-mail to Wampler: the nature of the pictures constitutes inappropriate conduct for a Club cheerleader and "it was never brought up that these pictures existed and they would be posted on a website";

(3) the explanation provided by the Club in response to Wampler's first EEOC charge: Wampler posed semi-nude and failed to disclose it to the Club; and

(4) the explanation provided during the lawsuit: Wampler posed nude and lied about it.

(Dkt. #39 at 23-24). In the Court's view, Ms. Wampler's argument elevates semantics over substance, as these explanations are neither shifting nor inconsistent. Although the stated reasons may be *phrased differently*, they are, from a substantive and common-sense standpoint, virtually the same. Indeed, it would perhaps be more suspicious if the Club used the *exact same language* to describe the reason for her termination each time it was prompted. As the Club notes, "if a hundred people looked at the pictures, not everyone would describe them using the same words or agree on whether Ms. Wampler was 'nude' or 'semi-nude,' whatever those terms mean." (Dkt. #42 at 9).

Second, Ms. Wampler emphasizes that the Club knew that she was Indonesian. This, in Ms. Wampler's view, contradicts the Club's claim that Ms. Pottratz, Mr. O'Hara, Mr. Zupancic, and Mr. Ward believed that Ms. Wampler was actually Caucasian. But, notably, the evidence establishes that Mr. Ward was the key decision-maker, and nothing establishes that he actually knew that Ms. Wampler was non-Caucasian (or that he was influenced by Ms. Pottratz under Ms. Wampler's unrealistic cat's paw theory). *See Holmes v. Potter*, 384 F.3d 356, 362 (7th Cir. 2004) ("Usually, an employer's lack of knowledge about a protected category rings a death knell for discrimination claims.") (citation omitted). Besides, even if the Club knew that Ms. Wampler was Indonesian, this would not show pretext. Rather, it would merely establish that the employer knew that the employee at issue was not one hundred percent Caucasian, which is an undisputed point in the vast majority of employment discrimination cases that involve a racial minority.

Third, pointing to the situation with Ms. Fonner, Ms. Wampler argues that the Club did not uniformly apply its rules. The Court is not persuaded. As a practical matter, Ms. Wampler's argument appears to be an invitation to merge the similarly-situated prong of the *prima facie*

case with a showing of pretext. It is true that the two inquires "are not hermetically sealed off from one another." *Coleman v. Donahoe*, 667 F.3d 835, 857-58 (7th Cir. 2012). But they are not perfectly fungible, especially where, as here, there are obvious distinguishing features between the two employees that reasonably explain the employer's disparate treatment. Thus, Ms. Wampler's argument and evidence does nothing to cast doubt on the legitimacy of the Club's explanation.

Fourth, and finally, Ms. Wampler argues that her conduct was simply insufficient to motivate her termination. This argument boils down to Ms. Wampler's view that her body-paint photos were not very scandalous, given the highly-sexualized nature of the Club cheerleading position. As Ms. Wampler notes, in her capacity as a Club cheerleader she posed in a swimsuit calendar wearing a skimpy bikini. Moreover, she participated in a half-time dance routine where the cheerleaders tore off their uniforms revealing bra-like tops and "booty" shorts and danced provocatively to Lenny Kravitz's blockbuster song "American Woman". In one portion of the routine, the cheerleaders sat with their legs straddled apart while rolling their heads back and forth flipping their hair around. (Dkt. #39 at 9.) In Ms. Wampler's view, how could the Club fire her for doing something that is similar in nature to her day-to-day duties as a cheerleader? To be sure, NFL cheerleaders are not puritans – nor should they be. The job necessarily entails wearing somewhat revealing outfits, dancing somewhat provocatively (but within reason, since NFL games are family affairs), and maintaining a fit and attractive physical appearance.[4]

This argument is well-taken, but the Court is not persuaded. The Club clearly had reasonable grounds for terminating Ms. Wampler's employment, and no evidence casts doubt on

[4] This statement is certainly not meant to disparage the character of NFL cheerleaders. In the Court's view, NFL cheerleaders are, by and large, hard-working and accomplished young women who contribute to the community, motivate the players, and enrich the NFL fan's experience.

the honesty of the Club's rationale for its decision. Simply stated, the pictures at issue violated the "Indianapolis Colts Cheerleader Agreement." Moreover, during her pre-hire interview, Ms. Wampler *arguably* lied about posing nude. Whether it was *actually* a lie depends on your conception of nudity. If a person uses latex body paint to cover his or her private parts, does that constitute nudity? Perhaps reasonable minds could disagree on this issue. (And the answer may turn on the quality and opaqueness of the paint at issue.) The relevant point is that the Club reasonably construed Ms. Wampler's statement as a lie.

In the end, perhaps the Club overreacted by terminating Ms. Wampler's employment. After all, qualitatively, what Ms. Wampler did at the Playboy mansion may not be significantly different than posing for a swimsuit calendar in a slinky bikini or performing a titillating dance number while wearing a bra-like top and booty shorts. In this sense, Ms. Wampler's frustration is understandable. But, when it comes to a pretext analysis, "we look not at the wisdom of the employer's decision, but rather at the genuineness of the employer's motives." *Stalter v. Wal-Mart Stores, Inc.*, 195 F.3d 285, 288-89 (7th Cir. 1999) (citation omitted). As the Club notes, it has a legitimate interest in drawing "a line between its cheerleaders dressing provocatively and being naked." (Dkt. #42 at 7). This is presumably what Mr. Ward was referring to when he professed that the Club expects its cheerleaders to be "alluring without being trashy." (Dkt. #22-1 at 2). In the end, no evidence casts doubt on the Club's stated reason for firing Ms. Wampler or suggests that her Indonesian race or national origin was in any way a motivating factor in that decision. In the Court's view, this case has nothing whatsoever to do with race and everything to do with perceived nudity and perceived lies. Because no reasonable juror could reach a different conclusion, the Club's motion must be granted.

Finally, shortly before this order was set to be issued, Ms. Wampler filed her Motion for Leave to File a Second Amended Complaint (Dkt. #48), seeking to formally drop her gender discrimination claim and to change her race discrimination claim from a Section 1981 claim to a Title VII claim (the EEOC recently issued a related right to sue letter). While this motion is well-taken, any amendment would ultimately be futile, since the Title VII race discrimination claims and Section 1981 race discrimination claims are subject to virtually identical standards. *See Malone v. Am. Friends Serv. Comm.*, No. 06-2736, 213 Fed. Appx. 490, 495 (7th Cir. 2007). This Court's analysis under Section 1981 or Title VII would render the same analysis and decision. Therefore, the Motion for Leave is denied.

## IV. CONCLUSION

For the reasons set forth above, the Defendant's Motion for Summary Judgment (Dkt. #20) is **GRANTED** and Plaintiff's Motion for Leave to File a Second Amended Complaint (Dkt. #48) is **DENIED**. Final judgment will accompany this Entry.

SO ORDERED. 08/13/2012

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Jonathan A. Bont
BOSE MCKINNEY & EVANS, LLP
jbont@boselaw.com

Daniel C. Emerson
BOSE MCKINNEY & EVANS, LLP
demerson@boselaw.com

Kimberly D. Jeselskis
JESELSKIS LAW OFFICES, LLC
kjeselskis@kdjlegal.com

Andrew M. McNeil
BOSE MCKINNEY & EVANS, LLP
amcneil@boselaw.com